ECKLES, Respondent, v. MISSOURI PACIFIC RAIL-WAY COMPANY, Appellant.

**St. Louis Court of Appeals, April 18, 1905.**

**(Opinion by Bland, P. J.)**

1. **COMMON CARRIERS: Contract of Carriage: Execution.** A contract for the carriage of goods filled out and signed by the agent·of the carrier who directed the routing, is conclusive upon the parties, although not signed by the shipper or the consignee.

2. ————: **Conflict of Laws.** A contract for the carriage of goods made in another State and to be ·wholly performed in other States, is interpreted by the rules of common law relating to carriers, in the absence of evidence as to what the law was in the State where the contract was made.

3. ————: **Connecting Carriers: Contract of Carriage.** At common law, a carrier who received goods for transportation to a point beyond his own line engages only to carry them safely to the end of his own line and deliver them to the next connecting carrier, unless the usage of business, or his contract, shows that he undertakes to carry the goods for the whole route.

4. ————: ————: **Through Rates.** The fact that the carrier receiving goods gives the through freight rate, does· not take the case out of the rule that his undertaking is to carry them over his own route only.

5. ————: ————: **Payment of Freight.** Where a carrier, receiving goods for transportation to a point, over connecting lines, receives the full payment for freight for the entire route, his contract is for the entire distance and he is responsible for the safe delivery at the end of the route.

6. ————: ————: ————: **Contract Limiting Liability.** But a carrier who receives goods, with the full payment of freight to destination thereon, for carriage to a distant point over connecting lines, may by contract protect itself against liability for loss not occurring on its own line.

7. ———: ———: **Through Contract: Traffic Arrangement With Connecting Carrier.** Where a carrier received goods for shipment to a distant point, over connecting lines, and selected the route, collected the freight charge for the entire distance, and it was shown that it had a traffic arrangement with the connecting carrier who received the goods for further transportation, the contract is a through one for which the receiving carrier is liable, notwithstanding a clause in the contract exempting it from liability for loss not occurring on its own line.

8. ———: ———: ———: ———. Such an exemption clause is construed to be inserted for the purpose of fixing liability of the several lines over which the goods are hauled, as between themselves, and not for the purpose of restricting liability to the shipper.

9. ———: ———: **Traffic Arrangement: Evidence.** In the absence of direct evidence of a traffic arrangement between connecting carriers which would make one the agent of the other, such arrangement may be inferred from circumstances, such as the selection by the receiving carrier of the line over which the goods are to be shipped.

10. ———: ———: **Changing Route.** Where a carrier, receiving goods for transportation over its own line and through connecting carriers, changed the route to a different connecting carrier without the consent or knowledge of the shipper and damage to the goods occurred on the connecting carrier, the receiving carrier was liable, notwithstanding a clause in the contract of shipment, exempting it from liability for loss other than that occurring on its own line.

**(Separate opinion by Goode, J.)**

11. ———: ———: **Contract Limiting Liability.** At common law, a carrier receiving freight for transportation over its own line and connecting lines, may by contract limit its liability to loss occurring on its own line, or may contract to carry only to the end of its own line, and escape liability for loss occurring on the line of the connecting carrier.

12. ——— : ———: **Through Contract.** A bill of lading which read "Received from Swift & Company the following packages, contents unknown, in apparent good order, marked and numbered as per margin to be shipped from South Omaha to Los Angeles, California, and delivered to a consignee or a connecting carrier, etc.," was a contract for through carriage and could be performed only by delivery to the consignee or a connecting carrier at the destination named, Los Angeles.

13. ——: ——: ——: Limiting Liability. Although such a contract contained a further clause providing the carrier should be liable only for a loss occurring on its own line, the fact that it collected the freight for the entire distance and controlled the routing of the car, makes a fair construction of the contract an agreement to transport the goods from Omaha to Los Angeles and that other railroads who assisted in the carriage did so as agents of the receiving carrier.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss*, Judge.

AFFIRMED.

*Martin L. Clardy* and *Henry G. Herbel* for appellant.

(1) The court erred in admitting illegal evidence offered by plaintiffs. McFadden v. Railway, 92 Mo. 350, 4 S. W. 689; O'Bryan v. Kinney, 74 Mo. 127; Railway v. Cleary. 77 Mo. 634; Wyrick v. Railway, 74 Mo. App. 415; Holten v. Railway, 61 Mo. App. 208; Gerber v. Railway, 63 Mo. App. 147; Railway v. Clements, 49 S. W. 913; Railway v. Hassell, 58 S. W. 54; Ferry Co. v. Railroad, 128 Mo. 248, 27 S. W. 568, 30 S. W. 430; Steffen v. Railway, 156 Mo. 323, 56 S. W. 1125; Ward v. Railway, 158 Mo. 226, 58 S. W. 28; Hance v. Railway, 56 Mo. App. 476; Railway v. Wilson, 50 S. W. 21; Cully v. Railway, 41 S. W. 21; U. S. v. Frt. Assn., 166 U. S. 290; U. S. v. Traffic Assn., 171 U. S. 505.    (2)    The court erred in refusing the instructions offered by defendant.    Nines v. Railway, 107 Mo. 457, 18 S. W. 26; Dimmitt v. Railway, 103 Mo. 433, 15 S. W. 761; Grain Co. v. Railway, 138 Mo. 668, 40 S. W. 894; Railway v. Crossman, 33 S. W. 290; Bennett v. Railway, 46 Mo. App. 668; Patterson v. Railway, 56 Mo. App. 660; Minter Bros. v. Railway, 56 Mo. App. 287; Harris v. Howe, 12 S. W. 225; Milling Co. v. Railway, 41 S. W. 810. (3)    As the trial court decided this case according to the statute law of Missouri, its ruling is in conflict with the Interstate Commerce Act, as well as the Constitu-

tion of this State and of the United States. Stanley v. Railway, 100 Mo. 435, 13 S. W. 709; Grimes v. Eddy, 126 Mo. 168, 28 S. W. 756; Selvedge v. Railway, 135 Mo. 163, 36 S. W. 652; Railway v. Ill., 118 U. S. 557.

*G. H. Ten Brock, L. C. Spooner* and *J. M. Holmes* for respondent.

(1) The contract sued on was a through contract from South Omaha to Los Angeles, and hence the attempt to limit the liability was void. McCann v. Eddy, 133 Mo. 69, 33 S. W. 71; Fruit Co. v. Railroad, 65 Pac. Rep. (No. 11), 948; Davis v. Jacksonville Line, 126 Mo. 69-80, 28 S. W. 965; Hutchinson on Carriers, secs. 145, 273. (2) The defendant is liable under the evidence whether the contract be a through one, or a forwarding one, from Pueblo west, at it was guilty of gross negligence as a forwarder, as well as in its capacity of carrier. Hutchinson on Carriers, secs. 310, 311, 314, 316, 280b, 145; Goodrich v. Thompson, 44 N. Y. 344; Goddard v. Mallory, 52 Barb. 87; Commission Co. v. Railroad, 64 Mo. App. 144; Railroad v. Boggs, 40 S. W. Rep. 21; Railway v. Alison, 59 Tex. 193; Thomson on Carriers, sec. 431; Schouler on Bailments and Carriers, secs. 590—594, 600-615; Dimmitt v. Railroad, 103 Mo. 443, 15 S. W. 761.

STATEMENT.

The material averments of the petition, on which the case was tried are as follows: Defendant owned and operated a railroad running from South Omaha, Nebraska, to Pueblo, Colorado, where it connects with other lines of railroad running from said point to the city of Los Angeles, California. Defendant is a common carrier of goods from South Omaha to Pueblo and, by itself and over roads connecting with it at Pueblo, on to Los Angeles. On the fourteenth day of November, 1890, plaintiffs purchased of Swift & Company one

thousand seven hundred and fifty-six pieces of meat, known to the trade as sweet pickled bellies, at twelve hundred dollars, and requested Swift & Company to ship the meat to Los Angeles and pay the freight thereon. Swift & Company, in pursuance of said instructions, made a contract in writing (filed with the petition) by which defendant agreed to transport the goods to Los Angeles for three hundred and fifty dollars, which were then and there paid to the defendant. The defendant agreed to transport the goods over its own road to Pueblo, from Pueblo to Trinidad over the Denver & Rio Grande Railroad, and from Trinidad over the Atchison, Topeka & Santa Fe Railroad to Los Angeles. The goods were loaded into a refrigerator car in good condition; the car iced and delivered to defendant at South Omaha, on the fourteenth day of November, 1890, and on the fifteenth day of November, 1890, Swift & Company drew a draft on plaintiff for the price of the goods, plus the freight, amounting in all to fifteen hundred and fifty-five dollars, which plaintiff paid. The goods reached Pueblo over defendant's road, on the seventeenth day of November, 1890, and reached Trinidad on the eighteenth of November, but the defendant wholly failed and refused to transport the goods farther than Trinidad or to deliver or cause them to be delivered to the Atchison, Topeka & Santa Fe Railroad Company, or any other carrier at that point for transportation, and for a period of fourteen days failed to forward the goods from Trinidad to Los Angeles. After a lapse of fourteen days defendant caused the goods to be transported by a connecting carrier, other than the Atchison, Topeka & Santa Fe Railroad, and they reached Los Angeles on the fifteenth day of December, 1890. During the fourteen days delay in forwarding the goods from Trinidad, defendant neglected to ice the car in which the goods were shipped and when they arrived at Los Angeles the meat was spoiled, soured and

tainted and was sold for soap grease for the sum of eighty-six dollars.

The answer admitted the receipt of the meat from Swift & Company and the making of the contract in writing with said company, which was filed with the petition as an exhibit, but denied that the contract imposed upon defendant the duty of transporting the meat beyond Pueblo, the western terminus of its line, or of forwarding it by way of other lines of railway to its destination, and alleged the performance of its duty under the contract by transporting the goods to Pueblo in good condition and on time, and by delivering them to the Denver & Rio Grande Railroad, a connecting carrier. So much of the contract for the carriage of the goods as is material to the issues is as follows:

"Form 1132.

"THE MISSOURI PACIFIC RAILWAY.

"South Omaha, Neb., Nov. 14, 1890.

"Received from Swift & Company, the following packages, contents unknown, in apparent good order, marked and numbered as per margin, to be transported from South Omaha to Los Angeles, Calif., and delivered to the consignee, or a connecting common carrier. The packages aforesaid may pass through the custody of several carriers before reaching their destination, and it is understood as a part of the consideration, for which said packages are received, that the exceptions from liability made by such carriers respectively shall operate in the carriage by them respectively of said packages, as though herein inserted at length; and especially that neither of said carriers, or either or any of them, or this company shall be liable for leakage of any kinds of liquids, . . or for damages to personal property of any kind, occasioned from delays, from any cause, or change of weather, or for loss or damage by fire, or for loss or damage on seas, lakes, canals, or rivers. And it is further especially understood, that for all loss or damage occurring in the transit of said pack-

ages, the legal remedy shall be against the particular carrier only in whose custody the said packages may actually be at the time of the happening thereof—it being understood that

The Missouri Pacific Railway Company,

in receiving the said packages to be forwarded as aforesaid, assume no other responsibility for their safety or safe carriage than may be incurred on its own road. All goods carried by this company are charged at actual gross weight, excepting such articles as are provided for in our general tariff. . . . .

"Notice.—This contract is accomplished and the liability of the companies as common carriers thereunder, terminates on the arrival of the goods or property at the station or depot of delivery, and the companies will be liable as warehousemen only thereafter, and unless removed by the consignee from the station or depot of delivery within twenty-four hours of their said arrival they may be removed and stored by the companies at owner's expense and risk.

"Notice.—In accepting this contract, the shipper or other agent of the owner of the property carried, expressly accepts and agrees to all its stipulations and conditions.

"Consigned to Order,          Notify Robert Eckles
     Swift & Company.               Company.
               "At Los Angeles, Calif.

| LIST OF ARTICLES | WEIGHT. |
| --- | --- |
| Rates Guaranteed.   A. R. T. Car No. 5461 | |
| $1.75 per 100 lbs.   1756 Pcs. S. P. Bellies | 20,000 |
| Freight Prepaired, 350.00. | |

"Reice In Transit If Necessary.
Care of D. & R. G. R. R. at Pueblo.
Care of A. T. & S. F. R. R. at Trinidad. Colo.
               "(Signed) J. M. GALLIGHER, Agt. J."

The evidence shows that the shipment was solicited by Daniel King, contracting agent for the Missouri routing. The evidence also tends to show that the car

in which the meat was shipped arrived at Pueblo in good order and on time, and that the meat was then in good condition; that it was promptly delivered to the Denver & Rio Grande Railroad, by which it was hauled to Trinidad and placed on a connecting line between the Denver & Rio Grande and the Atchison, Topeka & Santa Fe Railroad Companies, on November nineteenth, and by the latter road taken into its yards, a transfer sheet delivered to its agent without objection, and two hundred dollars tendered to pay the freight, which tender was refused on the claim that the road was entitled to the same rate as from Missouri river points. The evidence further tends to show that there was no traffic arrangement between the Missouri Pacific Railroad Company and the Atchison, Topeka & Santa Fe Railroad Company to receive transcontinental freight at Trinidad for less than the local rate ($1.30 per hundred pounds) but there was a traffic arrangement between the two roads that transcontinental freight received by the Missouri Pacific should be delivered to the Atchison, Topeka & Santa Fe at Kansas City, the through rate from Kansas City to Los Angeles being $1.75 per hundred pounds. On learning that the Atchison, Topeka & Santa Fe Railroad would not haul the goods from Trinidad for two hundred dollars, the Denver & Rio Grande Railroad Company hauled the car back to Pueblo and from there rerouted it over other connecting lines to Los Angeles, where it arrived on December 15, 1890. The car was immediately opened on its arrival and the meat found to be sour and tainted, and being unfit for any other purpose was sold for soap grease, for the sum of eighty-five dollars. The car was not reiced at Pueblo but was found well iced when it arrived at Los Angeles; when or by what road it was reiced does not appear from the evidence.

The defendant asked the court to declare the law as follows, which the court refused:

"1. The court declares the law to be, that under

the pleadings and evidence in this case plaintiffs are not entitled to recover and the finding will be for the defendant.

"2. The court declares the law to be, that if the court believes from the evidence that the meat in controversy was safely carried by defendant and delivered to the Denver & Rio Grande Railway Company at Pueblo, Colorado, in good condition, within a reasonable time after its delivery to defendant by Swift & Company at South Omaha, Nebraska, then plaintiffs are not entitled to recover and the finding will be for the defendant.

"3. The court declares the law to be, that defendant is not liable under the contract of shipment sued on herein and read in evidence for any damage to the meat in controversy, by delay or failure to reice occurring on any other railroad than the one operated by it; and if the court sitting as a jury finds from the evidence that defendant transported the meat in controversy from South Omaha, Nebraska, to Pueblo, Colorado, without unreasonable delay, and delivered said meat to the Denver & Rio Grande Railway Company at Pueblo, Colorado, within the time usually and reasonably required for such transportation and delivery, then the defendant is not liable in this case, nowithstanding said meat may have been delayed or not properly reiced on connecting lines, and the finding will be for the defendant."

The issues, by agreement of parties, were submitted to the court without the intervention of a jury. On the evidence the court found for plaintiffs, assessed their damages at fifteen hundred and fifty dollars and rendered judgment accordingly. A timely motion for rehearing was filed which the court overruled. Defendant appealed.

BLAND, P. J. (after stating the facts).—1. The evidence shows that defendant's agent solicited the ship-

ment of the goods from Swift & Company, named the routing and the through rate and furnished Swift & Company's agent with a blank printed form of contract, which was filled out in ink by the agent and presented to the defendant's agent at South Omaha, who signed it for the railroad company. We think this evidence is conclusive that both parties agreed to the contract, although it was not signed by the plaintiffs or by Swift & Company as their agent.

The shipment was made wholly without this State and for this reason the statutes of the State do not control. The statutes of Nebraska (the State in which the contract was made) were not offered in evidence, and as there is no presumption that the statute of one State exist in another, the rule of the common law must control in the interpretation of the contract and the defendant's liability thereunder. [Morrisey v. Ferry Co., 57 Mo. 521.]

In Crouch v. Railway, 42 Mo. App. l. c. 249, THOMPSON, J., said:

"By the principles of the common law, as established in this State, a common carrier, who receives goods for transportation to a point beyond his own line, engages only to carry them safely and within a reasonable time to the end of his own line, and deliver them to the next connecting carrier to continue or complete the transit, unless the usage of the business, or of the carrier, or his conduct or language, shows that he takes the parcel as carrier for the whole route. [Coates v. United States Express Co., 45 Mo. 238; McCarthy v. Railroad, 9 Mo. App. 159, 166; Goldsmith v. Railroad, 12 Mo. App. 479, 483.] Nor does the fact that the carrier, so receiving the goods, gives a through rate of freight, take the case out of this rule; but he is still deemed to have received them in the character of carrier for his own route, and of forwarding agent for the shipper for the remaining route. McCarthy v. Railroad, supra; Goldsmith v. Railroad, supra."

There are many authorities, including some Missouri cases, which hold that payment of full freight for carriage between two points is a contract to carry between those two points, and that the first carrier is responsible for the delivery of the goods. [Davis v. Jacksonville Southeastern Line, 126 Mo. 69, 28 S. W. 965; Lin v. Railroad, 10 Mo. App. 125; Fischer v. Transportation Co., 13 Mo. App. 133; Baltimore & Ohio Steamboat Co. v. Brown, 54 Pa. St. 77; Jennings v. Railway, 127 N. Y. 438; Atlanta & West Point R. R. Co. v. Texas Grate Co., 81 Ga. 602; Falvey v. Georgia Railroad, 76 Ga. 597; Hill Mfg. Co. v. Railroad, 104 Mass. 122; Adams Express Co. v. Wilson, 81 Ill. 339; Perkins v. Railroad, 47 Me. 573.] On the other hand, there are many respectable decisions, especially by the Federal Courts, holding that prepayment of the through rate of freight does not oblige the initial carrier to do more than safely,. and within a reasonable time, deliver the goods to its connecting carrier. But we think the doctrine of the cases last above cited is more consonant with reason and fairer to the shipper. And we do not understand defendant's contention to be that the shipment was not a through one, but as the goods had to be transported over several lines of railroad to reach their destination (a fact known to the shipper) it was competent for the defendant, by contract, to protect itself against liability for loss not occurring on its own line. That it might protect itself against liability not occurring on its own line, we think, is well settled by the following authorities. [Read v. Railroad, 60 Mo. 199; Nines v. Railway, 107 Mo. 475, 18 S. W. 26; Ketchum v. Express Co., 52 Mo. 390; Snyder v. Express Co., 63 Mo. 376; Myrick v. Railroad, 107 U. S. 102; Mulligan v. Railway, 36 Iowa 186; Detroit & Milwaukee Railroad Company v. Bank, 20 Wis. 122; Pendergast v. Express Co., 101 Mass. 120; Berg v. Railroad, 30 Kan. 561; St. L. & I. Mt. R. R. Co. v. Larned, 103 Ill. 239; Keller v.

Railroad, 46 Alt. Rep. (Pa.) 261; Harris v. Howe, Receiver, 74 Texas 534.]

The contract of shipment expressly provides:

"This contract is accomplished and the liability of the companies as common carriers thereunder, terminates on the arrival of the goods or property at the station or depot of delivery."

And if there was nothing in the waybill itself and no evidence to qualify the exemption clause, we would without hesitation, hold that the defendant's liability ceased when, without reasonable delay, it delivered the car to the Denver & Rio Grande Railroad Company. But the evidence shows that the defendant selected the particular lines of railroad over which the car should be transported to its destination and had these lines of road specially designated on the waybill, and collected and receipted for a through freight charge. The evidence also tends to show that the defendant had a traffic arrangement with the Atchison, Topeka & Santa Fe Railroad Company for the transportation of transcontinental freight, whereby a through rate was agreed upon which was to be shared in common by them. We think the reasonable inference to be drawn from this evidence is that the defendant made the Denver & Rio Grande and the Atchison, Topeka & Santa Fe Railroad Companies its agents for the transportation of the car of meat to Los Angeles, and that the exemption clause was inserted in the waybill for the purpose of fixing liability as between the several lines, over which the car would have to be hauled to reach its destination, and does not have the effect to restrict defendant's liability to the shipper for losses which might occur on its own line. We so construed the contract on the former appeal (72 Mo. App. 296) and think this construction is supported by the case of Harp v. Grand Era, 1 Woods (U. S. C. C. ) 184, where it was held:

"Where several carriers unite to complete a line of transportation and receive goods for one freight, and

give a through bill of lading, each carrier is the agent of all the others to accomplish the carriage and delivery of the goods, and is liable for any damage to them, on whatever part of the line the damage is received."

A similar ruling was made in Baltimore & Ohio R. R. Co. v. Wilkens, 44 Md. 11; in Barton v. Wheeler, 49 N. H. 25, and in Wyman v. Railroad, 4 Mo. App. l. c. 39, where it is said:

"It may be regarded as equally well settled, upon authority, that if several common carriers, having each its own line, associate and form what to the shippers is a continuous line, and contract to carry goods through for an agreed price, which the shipper or consignee pays in one sum, and which the carriers divide among them, then, as to third parties and with whom they contract, they are liable jointly for a loss taking place on any part of the whole line. [Barton v. Wheeler, 49 N. H. 25; Bradford v. Railroad, 7 Rich. 201; Cincinnati, etc., R. Co. v. Spratt, 2 Duv. 4; Nashua Lock Co. v. Railroad Co., 48 N. H. 339; Quimby v. Vanderbilt, 17 N. Y. 306; Chouteaux v. Leach, 18 Pa. St. 224; Boston, etc., Steamboat Co. v. Brown, 54 Pa. St. 77; Hart v. Railroad, 4 Seld. 37.]"

Also to the same effect is the case of Cummins v. Railway, 9 Am. & Eng. Railroad Cases 36, where it was ruled:

"Railroad companies have the power to contract to carry goods beyond their own line, and where they enter into such contract they will be liable as a common carrier throughout the whole transit.

"Three railroad companies, whose lines formed a continuous road between X and Y, held themselves out to the public as having formed a combination for the transportation of goods on the entire route. A at X shipped goods with one of the companies addressed to B at Y, and took a receipt whereby the company undertook to forward as per directions. Said receipt contained numerous provisions limiting liability, and pro-

vided that· all the carriers transporting the property as a part of the through line should be entitled to all the exceptions and conditions therein mentioned. *Held,* that said carrier had contracted to carry the, goods through to Y, and was liable for a loss occuring in consequence of delay in. said transit although the same occurred beyond his own line."

It is true, there is no direct evidence to show 'that the Denver & Rio Grande Railroad Company was a party to the traffic arrangement shown to exist between the. defendant and the Atchison, Topeka·& Santa Fe Railroad Company, but we think, from its selection as one of the connecting carriers and from the evidence and circumstances shown in the case, it may reasonably be inferred that it was either a party to the arrangement or was selected by defendant company as its agent to forward the car to the Atchison, Topeka & Santa Fe Railroad Company. When such connection or. agency ·is shown, Hutchinson says: "It is universally agreed that if any connection of that character exists by which they they become participants in common in the profits of the business, any one or all of them may be held liable at the option of the loser." Hutchinson on Carriers, sec. 158.

The routing of the car was diverted without the con-· sent or knowledge of the shipper, and the evidence shows that this change of route caused the delay and the damage to the goods. The agreement was specific that the car should be transported .over the roads designated on the bill of lading. This agreement was not satisfied by a change in the routing and was a clear breach of the contract. [Hutchinson on Carriers, sec. 310; Goodrich v. Thompson, 44 N. Y. 324.] And the defendant is liable notwithstanding the exemption clause in the bill of lading. [G. H. & H. Ry. Co. v. Allison, 59 Texas 193; Texas & P. Ry. Co. v. Boggs, 40 S. W. 20; Stewart v. Transportation Co, 47 Iowa 229; Illinois C. R. Co. v.· Southern Seating & Cabinet Co., 50 L. R. A. (104 Tenn. 568) 729.]

We think the court properly refused defendant's declarations of law and that the evidence supports the judgment. The judgment is therefore affirmed. All concur.

### SEPARATE OPINION.

GOODE, J.—That the appellant was liable as a common carrier for the loss of the carload of meat in controversy at any point of its transit from Omaha to Los Angeles, was adjudged on the former appeal of this case and the decision of the present appeal might have rested on that fact alone. 72 Mo. App. 296. But I think the very words of the bill of lading show the appellant contracted to transport the meat from South Omaha, Nebraska, to Los Angeles, California, and deliver it at the latter point to the consignee or a connecting common carrier. The meat was ruined in transit by somebody's negligence. It was too long on the road and was not iced at proper times. Moreover our conviction is strong that appellant is to blame for the delay, as it must have known the dispute between it and the Santa Fe Railway Company was likely to cause the latter to refuse to receive the car on the division of the freight money accorded by appellant. This dispute had arisen prior to the shipment in controversy, and when appellant routed the car to be delivered to the Santa Fe at Trinidad, it invited loss. It had no arrangement with the Santa Fe Company to receive freight at that point and knew the latter company insisted on not receiving it there. If the appellant's contract was to carry over the whole route, it cannot be excused from liability for the loss of the meat by negligence, even though the loss occurred while it was in the custody of some intermediate carrier. The appellant remained responsible throughout. If the appellant had stood on its common law right and contracted to carry to the end of its line only, or had it not contracted to carry further,

the clause in the bill of lading exonerating it from liability for losses occurring on other than its own line, would be valid. The case is really one of interpretation of the contract: What did the appellant agree to do? The first sentence of the bill of lading is as follows:

"Received from Swift & Company, the following packages, contents unknown, in apparent good order, marked and numbered as per margin, to be transported from South Omaha to Los Angeles, Calif., and delivered to the consignee, or a connecting common carrier."

That language made a contract for through carriage by the appellant, which contract could be completed, only by delivery to the consignee, or a connecting carrier at the destination named; not to a connecting carrier anywhere on the route, but at Los Angeles. There is a subsequent clause in the bill of lading which implies that the appellant received the goods to be forwarded over lines of connecting carriers and recites that it assumed no responsibility for the safety of the meat except on its own line. In view of the facts in proof the use of the words "to be forwarded" did not make the contract one on the part of the appellant to carry only over its own line and thereafter be liable as forwarder and not as carrier for the balance of the route. Hutchinson, Carriers (2 Ed.), sec. 157 and cases cited in note. The appellant collected the freight for the whole journey and took part in, if it did not control, the routing of the car. In my opinion the only fair construction of this contract is that the appellant was to transport the goods from Omaha to Los Angeles; and that other railroad companies which assisted in carrying out the contract, did so as agents of the appellant. Nanson v. Jacob, 12 Mo. App. 125; Germain Fruit Co. v. R. R., 65 Pac. Rep. 948. So far as the evidence shows this appellant need not have contracted to carry beyond its own line. The contract was a Nebraska one and the Nebraska statute which would make the contract a through one in any event, was not put in evidence. But in point of fact and

by express words, the appellant's agreement was to carry over the entire route. Therefore, it cannot be excused from liability for the negligent acts of intermediate carriers who must be regarded as its agents. In the Missouri cases cited and relied on by appellant it did not appear that the bill of lading bound the initial carrier to transport the goods to destination. In Nines v. R. R., 107 Mo. 475, the petition alleged the defendant agreed to carry the property to destination and the answer denied that allegation and averred the defendant agreed to carry no further than St. Louis, its terminus. In Dimmitt v. R. R., 103 Mo. 432, 15 S. W. 761; Miller, etc., Co. v. R. R., 138, Mo. 658, 40 S. W. 894, the bills of lading showed on their faces that the defendant companies agreed to carry, not to destinations, but to the end of their respective lines. I think the judgment should be affirmed.